1

POMERANTZ LLP
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Attorney for Plaintiff*

*[Additional Counsel on Signature Page]*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DONGPING CAO, Individually and on Behalf of All Others Similarly Situated,<br><br>                              Plaintiff,<br><br>                    v.<br><br>UBER TECHNOLOGIES, INC., DARA KHOSROWSHAHI, and NELSON CHAI,<br><br>                              Defendants. | Case No.<br><br>CLASS ACTION<br><br>COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Dongping Cao ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Uber Technologies, Inc. ("Uber" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff

1

believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Uber common stock between May 31, 2019 and July 8, 2022, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.     Uber develops and operates proprietary technology applications in the U.S., Canada, Latin America, Europe, the Middle East, Africa, and the Asia Pacific.  The Company connects consumers with providers of ride services, and connects riders and other consumers with restaurants, grocers, and other stores with delivery service providers for meal preparation, grocery, and other delivery services.

3.     Uber has long been plagued by scandal.  As the Company's Senior Vice President of Marketing and Public Affairs recently stated: "There has been no shortage of reporting on Uber's mistakes prior to 2017.  Thousands of stories have been published, multiple books have been written—there's even been a TV series."  These "mistakes" ranged from allegations of Uber executives knowingly concealing incidents of violence and sexual assault by its drivers, operating illegally in various jurisdictions, and utilizing software to evade authorities and block their access to the Company's databases.

4.     Following years of negative publicity, Uber made changes to its top management, purportedly reformed its corporate culture, and touted itself as a new company that had atoned

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

for its prior compliance and cultural issues.  However, unbeknownst to investors, the Company and its top management had still not transparently divulged and accounted for the full scope of the Company's prior misconduct.

5.     Throughout the Class Period, Defendants made materially false and misleading statements regarding Uber's business, operations, and compliance policies.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Uber had defective disclosure controls and procedures; (ii) Uber concealed and/or downplayed the full scope and severity of its prior misconduct, including, *inter alia*, the extent to which it secretly lobbied government officials and politicians to bypass legal and regulatory requirements, as well as knowingly risked the safety of Uber drivers, to fuel the Company's global growth; (iii) as a result, Uber's present global footprint and market share is in significant part the byproduct of previously undisclosed, unsustainable, and illegal business practices; (iv) all the foregoing, once revealed, was likely to negatively impact Uber's reputation, as well as subject the Company to a heightened risk of governmental and regulatory scrutiny and enforcement action; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

6.     On Sunday, July 10, 2022, news reports emerged regarding a cache of 124,000 internal Uber records, dubbed the "Uber Files" by media outlets, spanning from 2013 to 2017, that were leaked to *The Guardian* and subsequently shared with the International Consortium of Investigative Journalists ("ICIJ") and other news outlets.   These files revealed, among other things, how Uber secretly met with various government officials and politicians to skirt laws and regulations around the world, as well as risked Uber drivers' safety, to advance the Company's growth, and how all the foregoing conduct was known to, and in fact encouraged by, the Company's top management.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

7.      On this news, Uber's stock price fell $1.15 per share, or 5.15%, to close at $21.19 per share on July 11, 2022.

8.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

11.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Uber is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' activities took place within this Judicial District.

12.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

13.     Plaintiff, as set forth in the attached Certification, acquired Uber common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

14.     Defendant Uber is a Delaware corporation with principal executive offices located at 1515 3rd Street, San Francisco, California 94158.  Uber's common stock trades in an efficient market on the New York Stock Exchange ("NYSE") under the trading symbol "UBER".

15.     Defendant Dara Khosrowshahi ("Khosrowshahi") has served as Uber's Chief Executive Officer ("CEO") and a Director of the Company at all relevant times.

16.     Defendant Nelson Chai ("Chai") has served as Uber's Chief Financial Officer at all relevant times.

17.     Defendants Khosrowshahi and Chai are sometimes referred to herein as the "Individual Defendants."

18.     The Individual Defendants possessed the power and authority to control the contents of Uber's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of Uber's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Uber, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

19.     Uber develops and operates proprietary technology applications in the U.S., Canada, Latin America, Europe, the Middle East, Africa, and the Asia Pacific.  The Company connects consumers with independent providers of ride services, and connects riders and other

5

consumers with restaurants, grocers, and other stores with delivery service providers for meal preparation, grocery, and other delivery services.

20.     Uber has long been plagued by scandal.  As the Company's Senior Vice President of Marketing and Public Affairs recently stated: "There has been no shortage of reporting on Uber's mistakes prior to 2017.  Thousands of stories have been published, multiple books have been written—there's even been a TV series."  These "mistakes" ranged from allegations of Uber executives knowingly concealing incidents of violence and sexual assault by its drivers, operating illegally in various jurisdictions, and utilizing software to evade authorities and block their access to the Company's databases.

21.     Following years of negative publicity, Uber made changes to its top management, purportedly reformed its corporate culture, and touted itself as a new company that had atoned for its prior compliance and cultural issues.  However, unbeknownst to investors, the Company and its top management had still not transparently divulged and accounted for the full scope of the Company's prior misconduct.

**Materially False and Misleading Statements Issued During the Class Period**

22.     The Class Period begins on May 31, 2019, the day after Uber issued a press release announcing the Company's first quarter 2019 results—the Company's first financial results as a publicly traded company.  That press release quoted the Individual Defendants, each of whom touted Uber's global market position as a key competitive advantage, as well as the Company's growth realized through that market position.  For example, Defendant Khosrowshahi stated, in relevant part, that "[o]ur global reach continues to be an important differentiator, and we maintained leadership of the ridesharing category in every region we serve"; and Defendant Chai stated, in relevant part, that "[o]ur investments remain focused on global platform expansion and long-term product and technology differentiation," and "[w]e maintained stable regional

6

risesharing category position in the quarter and started to see signs of less aggressive pricing by some ridesharing competitors, which has continued into Q2 2019."

23.     On March 2, 2020, Uber filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operational results for the quarter and year ended December 31, 2019 (the "2019 10-K").   With respect to Uber's disclosure controls and procedures, the 2019 10-K stated, in relevant part:

> We maintain disclosure controls and procedures that are designed to provide reasonable assurance that information required to be disclosed in our [Exchange Act] reports is recorded, processed, summarized and reported within the time periods specified in the [SEC]'s rules and forms and that such information is accumulated and communicated to our management, including [the Individual Defendants], as appropriate, to allow for timely decisions regarding required disclosure . . . . [O]ur management, including [the Individual Defendants], evaluated the effectiveness of our disclosure controls and procedures as of the end of the period covered by th[e 2019 10-K]. Based upon that evaluation, [the Individual Defendants] concluded that, as of the end of the period covered by th[e 2019 10-K], our disclosure controls and procedures are effective at a reasonable assurance level.

24.     The 2019 10-K also provided generic, boilerplate, and downplayed risk warnings regarding Uber's historically problematic workplace culture and related compliance issues, stating, in relevant part, that "[o]ur workplace culture and forward-leaning approach created significant operational and cultural challenges that have in the past harmed, and may in the future continue to harm, our business results and financial condition"; that "[o]ur focus on aggressive growth and intense competition, and our prior failure to prioritize compliance, has led to increased regulatory scrutiny globally"; and that "[o]ur workplace culture also created a lack of transparency internally"; while simultaneously assuring investors of "our ongoing commitment to address and resolve our historical cultural and compliance problems and promote transparency and collaboration" and "embraced . . . culture of enhanced transparency under our new management[.]"

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

25.     With respect to allegations of prior misconduct by Uber, the 2019 10-K stated, *inter alia*, that "we had a number of highly publicized events and allegations, including investigations related to a software tool allegedly designed to evade and deceive authorities"; that "[i]n certain jurisdictions, including key markets such as Argentina, Germany, Italy, Japan, South Korea, and Spain, our ridesharing business model has been blocked, capped, or suspended, or we have been required to change our business model, due primarily to laws and significant regulatory restrictions in such jurisdictions"; that "[w]e received requests from the [U.S. Department of Justice] in May 2017 and August 2017 with respect to an investigation into allegations of small payments to police in Indonesia and other potential improper payments in other countries in which we operate or have operated, including Malaysia, China, and India"; and that "[t]he Company has been subject to various government inquiries and investigations surrounding the legality of certain of the Company's business practices, [and] compliance with . . . other global regulatory requirements"; while assuring investors that "[t]he Company has investigated many of these matters and is implementing a number of recommendations to its managerial, operational and compliance practices, as well as seeking to strengthen its overall governance structure."

26.     With respect to the benefits Uber enjoyed as a result of its global growth, the 2019 10-K stated, in relevant part:

> Revenue increased $2.9 billion, or 26%, primarily attributable to an increase in Gross Bookings of 31% which was made up of a 20% increase in Rides, an 83% increase in Eats, and a 121% increase in other offerings including Freight and Other Bets. The overall increase in Gross Bookings was driven by a 22% increase in [Monthly Active Platform Consumers ("MAPCs")] due to global expansion of our Eats product offerings combined with wider market adoption of our Rides product, and overall growth in our other offerings.

27.     Appended as exhibits to the 2019 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein the Individual Defendants certified that the 2019 10-K "fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and

that the "information contained in [2019 10-K] fairly presents, in all material respects, the financial condition and results of operations of Uber[.]"

28.     On March 1, 2021, Uber filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operational results for the quarter and year ended December 31, 2020 (the "2020 10-K").  That filing contained substantively the same statements as referenced in ¶¶ 23-24, *supra*, regarding the design and effectiveness of Uber's disclosure controls and procedures, as well as the Company's historically problematic workplace culture and related compliance issues, while continuing to assure investors of the Company's new culture of purportedly enhanced transparency.

29.     With respect to allegations of prior misconduct by Uber, the 2020 10-K stated, *inter alia*, that "[p]revious negative publicity, particularly as a result of cultural issues in 2017, has adversely affected our brand and reputation, which [*inter alia*] . . . invites legislative and regulatory scrutiny, and results in litigation and governmental investigations"; and that "[i]n certain jurisdictions, including expansion markets such as Argentina, Germany, Italy, Japan, South Korea, and Spain, our ridesharing business model has been blocked, capped, or suspended, or we have been required to change our business model, due primarily to laws and significant regulatory restrictions in such jurisdictions."

30.     With respect to the benefits Uber enjoyed as a result of its global growth, the 2020 10-K stated, in relevant part: "Delivery Gross Bookings grew 110% from 2019, on a constant currency basis, outpacing Delivery Trip growth driven by a 32% increase in basket sizes globally driven by stay-at-home order demand related to COVID-19."

31.     Appended as exhibits to the 2020 10-K were substantively the same SOX certifications as referenced in ¶ 27, *supra*, signed by the Individual Defendants.

32.     On February 24, 2022, Uber filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operational results for the quarter and year ended December 31, 2021 (the "2021 10-K").  That filing contained substantively the same statements as referenced in ¶¶ 23-24 and 29, *supra*, regarding the design and effectiveness of Uber's disclosure controls and procedures, as well as the Company's historically problematic workplace culture and related compliance issues and allegations of prior misconduct, while continuing to assure investors of the Company's new culture of purportedly enhanced transparency.

33.     With respect to the benefits Uber enjoyed as a result of its global growth, the 2021 10-K stated, in relevant part:

> Revenue increased $6.3 billion, or 57%, primarily attributable to an increase in Gross Bookings of 56%, or 53% on a constant currency basis. The increase in Gross Bookings was primarily driven by an increase in Delivery Gross Bookings of 71%, or 66% on a constant currency basis, due to an increase in food delivery orders and higher basket sizes as a result of [*inter alia*] . . . continued expansion across U.S. and international markets.

34.     Appended as exhibits to the 2021 10-K were substantively the same SOX certifications as referenced in ¶ 27, *supra*, signed by the Individual Defendants.

35.     The statements referenced in ¶¶ 22-34 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about Uber's business, operations, and compliance policies.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Uber had defective disclosure controls and procedures; (ii) Uber concealed and/or downplayed the full scope and severity of its prior misconduct, including, *inter alia*, the extent to which it secretly lobbied government officials and politicians to bypass legal and regulatory requirements, as well as knowingly risked the safety of Uber drivers, to fuel the Company's global growth; (iii) as a result, Uber's present global footprint and market share is in significant part the byproduct of

1  previously undisclosed, unsustainable, and illegal business practices; (iv) all the foregoing, once

2  revealed, was likely to negatively impact Uber's reputation, as well as subject the Company to a

3  heightened risk of governmental and regulatory scrutiny and enforcement action; and (v) as a

4  result, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

36.     On Sunday, July 10, 2022, news reports emerged regarding a cache of 124,000

internal Uber records, dubbed the "Uber Files" by media outlets, spanning from 2013 to 2017,

that were leaked to *The Guardian* and subsequently shared with the ICIJ and other news outlets.

These files revealed, among other things, how Uber secretly met with various government

officials and politicians to skirt laws and regulations around the world, as well as risked Uber

drivers' safety, to advance the Company's growth, and how all the foregoing conduct was known

to, and in fact encouraged by, the Company's top management.

37.     For example, between July 10 and July 11, 2022, *The Guardian* published a series

of exposé articles on Uber based on the Uber Files, citing "more than 83,000 emails, iMessages

and WhatsApp messages, including often frank and unvarnished communications" by and

between Uber's top management, which "revealed the inside story of how the tech giant Uber

flouted laws, duped police, exploited violence against drivers and secretly lobbied governments

during its aggressive global expansion." *The Guardian* reported that "Mark MacGann, Uber's

former chief lobbyist for Europe, the Middle East and Africa, came forward to identify himself

as the source of the leaked data[,]" stating: "It is my duty to speak up and help governments and

parliamentarians right some fundamental wrongs . . . . Morally, I had no choice in the matter."

38.     *The Guardian* reported that the Uber Files "show[] how Uber tried to shore up

support by discreetly courting prime ministers, presidents, billionaires, oligarchs and media

barons" with a "strategy [that] often involved going over the heads of city mayors and transport

11

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

authorities and straight to the seat of power." According to *The Guardian*, "[t]he [leaked] documents indicate Uber was adept at finding unofficial routes to power, applying influence through friends or intermediaries, or seeking out encounters with politicians at which aides and officials were not present." Uber reportedly "enlisted the backing of powerful figures in places such as Russia, Italy and Germany by offering them prized financial stakes in the startup and turning them into 'strategic investors'" and, in some jurisdictions, "succeeded in persuading governments to rewrite laws, with lasting effects."

39. For example, *The Guardian* cited "texts between [Uber's co-founder and former CEO, Travis] Kalanick and [French President] Emmanuel Macron, who secretly helped the company in France when he was economy minister, allowing Uber frequent and direct access to him and his staff[,]" and who "appears to have gone to extraordinary lengths to help Uber, even telling the company he had brokered a secret 'deal' with its opponents in the French cabinet." While *The Guardian* acknowledged that "[i]t was not a secret that Macron was enthusiastic about US tech companies," it also noted that "his closeness to the cab-hailing firm has never been fully revealed[,]" that "Macron . . . failed to record at least three of four meetings with [Kalanick] that were detailed in the files[,]" and that "Macron is facing calls for a parliamentary inquiry, after the Uber files exposed his extraordinary efforts as French economy minister . . . to help [Uber] lobby against the closed-shop taxi industry."

40. Likewise, *The Guardian* reported that "[t]he European Commission is facing calls to launch an inquiry into its former vice-president Neelie Kroes, after leaked files suggested she secretly helped Uber lobby the Netherlands prime minister, Mark Rutte, and a string of other national Dutch politicians." As reported by *The Guardian*, "Uber considered its relationship with Kroes so sensitive that the company's top European lobbyist repeatedly instructed colleagues to keep it hidden, warning in 2015 that it was 'highly confidential and should not be discussed

outside this group'." *The Guardian* cited "transparency experts [who] said the covert help Kroes seemingly provided the cab-hailing app – which was under criminal investigation in the Netherlands at that time – may have breached EU ethics rules." Specifically, "[t]he data appears to show Kroes . . . offering to arrange a series of meetings for Uber during her 18-month 'cooling-off period' after leaving the commission" even though "[t]he cooling-off period aims to reduce conflicts of interest by restricting the jobs commissioners can take once they have stepped down." According to *The Guardian*, "[i]n Kroes's case [the cooling-off period] ran from November 2014 until May 2016, when it was announced she was joining Uber's public policy advisory board[,]" for which "she was paid $200,000 a year, the documents suggest." As reported by *The Guardian*, "[d]espite a commission ban on taking that role before May 2016, Kroes spoke to Dutch government ministers about Uber and offered to set up talks with senior EU officials, according to the leaked files[,]" and "when Uber's Amsterdam headquarters were raided by police in the spring of 2015, Kroes called Dutch government ministers to get regulators to 'back off' as she 'harassed' a top civil servant, internal Uber emails claim."

41. Similarly, *The Guardian* reported how the Uber Files laid bare "Uber's previously unknown lobbying campaign in Russia[,]" including, among other things, how "Uber secretly hired a political operative linked to Russian oligarchs in an attempt to buy influence in the country, despite concerns that paying the lobbyist risked bribes being paid to 'grease the skids'." *The Guardian* cited "[f]ormer US prosecutors and corruption experts [that] said the circumstances in which Uber hired [Vladimir] Senin"—"an influential lobbyist at the time and now a pro-Kremlin member of the State Duma"—"in 2016 should have raised 'red flags' and risked breaching US anti-bribery laws." According to *The Guardian*, these experts agreed that "[a]mong the red flags Uber should have identified . . . was Senin's position in the pro-Kremlin political

1  party."[1] *The Guardian* stated that "[b]emused at the notion of making a large side payment to a

2  political fixer, executives balked when Senin quoted $800,000 to influence the taxi legislation

3  and lobby government officials." According to *The Guardian*, "[e]mails suggest[ed] Uber's

4  lawyers raised concerns that paying Senin risked breaching US anti-bribery laws" and "[a] senior

5  executive told colleagues that lawyers were 'rightly concerned about bribes being paid to grease

6  the skids'." As reported by *The Guardian*, "[d]espite the risks, Uber pressed forward and in May

7  2016 initially agreed to pay Senin as much as $650,000." *The Guardian* also cited "Jessica

8  Tillipman, an FCPA expert at George Washington University, [who] described Uber's deal with

9  Senin as a 'super high-risk transaction' and a 'blazing red flag'." *The Guardian* reported that

10  although "taxi legislation ran into trouble and did not pass[,]" which "prompted doubts about

11  Senin," the Company nonetheless "paid [Senin] a reduced sum of $300,000 for his work."

12  According to *The Guardian*, "[w]hen Senin emailed Uber his invoice in July 2016, he asked for

13  the funds to be wired via a New York bank to an account in Russia for a company created on the

14  day he had signed the Uber contract months earlier" and, "[i]n the email, sent to a senior Uber

15  executive, Senin used a pseudonym: 'Alter ego.'"

16      42.     The Uber Files also reportedly "show[ed] that between 2015 and 2016 Uber's

17  objective was to enlist [Russian] business magnates as 'strategic allies', offering their companies

18  coveted shares in the Silicon Valley company before a widely anticipated stock market flotation"

19  in return for political support. For example, Uber approached "[Alisher] Usmanov, the Uzbek-

20  born metals and technology magnate" and "secured a $20m investment from the billionaire's

21  holding company USM months later." *The Guardian* reported that "[a] spokesperson for

22  Usmanov said the deal was brokered by an investment bank and was a 'purely financial

---

[1] As noted by *The Guardian*, "[u]nder the FCPA, a US company is prohibited from corruptly paying – or offering to pay – a foreign political party official to induce them to use their influence."

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

investment' with 'nothing to do with politics or the Russian government'" and said that "USM made 'no promises or commitments' to Uber regarding government relations[.]"  However, *The Guardian* noted that "Kalanick . . . met two of Usmanov's top executives at Davos in January 2016 in an effort to raise more money" and "[a] briefing prepared for the meeting described Uber's messaging: invest and 'give us government relations support'."  According to *The Guardian*, "[t]he Russians were receptive, an internal note suggests[,]" stating "USM made the pitch as to what they could do to move the needle on the policy front."  Likewise, "[o]n the fringes of the 2016 World Economic Forum, Kalanick squeezed in a crucial meeting . . . with an emissary from LetterOne (L1), a private investment vehicle controlled by [Mikhail] Fridman"—another Russian billionaire—and weeks later Uber issued "a press release herald[ing] L1's $200m investment," although "executives appeared keen to ensure a key aspect of the deal remained secret."  Specifically, "[a]longside the $200m investment, Uber granted L1 a package of warrants that gave the firm the option to later purchase $50m of additional Uber shares at an advantageous price" that "would vest if Uber's trips in Russia continued to grow" with "[d]ocuments suggest[ing] Uber designed the warrants to 'incentivise' and 'motivate' L1 to help the US company solve its political and regulatory issues in Russia[.]"

43.     Additionally, the Uber Files reportedly showed how President Joe Biden, then U.S. Vice-President and "a supporter of Uber at the time," had met with Kalanick at the World Economic Forum at Davos, and thereafter "appears to have amended his prepared speech at Davos to refer to a CEO whose company would give millions of workers 'freedom to work as many hours as they wish, manage their own lives as they wish'."  *The Guardian* also reported that "[i]n addition to meeting Biden at Davos, Uber executives met face-to-face with Macron, the Irish prime minister, Enda Kenny, the Israeli prime minister, Benjamin Netanyahu, and George Osborne, the UK's chancellor at the time[,]" with "[a] note from the meeting portray[ing] Osborne

15

as a 'strong advocate'." *The Guardian* acknowledged that "[w]hile the Davos sitdown with Osborne was declared, the data reveals that six UK Tory cabinet ministers had meetings with Uber that were not disclosed" and "[i]t is unclear if the meetings should have been declared, exposing confusion around how UK lobbying rules are applied."

44.    In a separate vein, *The Guardian* reported that Uber knowingly put its drivers in harm's way to further its business strategy.  For example, *The Guardian* reported that "[a]s Uber launched across India, Kalanick's top executive in Asia urged managers to focus on driving growth, even when 'fires start to burn'" and stated that "this is a normal part of Uber's business," and to "[e]mbrace the chaos."  According to *The Guardian*, "Kalanick appeared to put that ethos into practice in January 2016, when Uber's attempts to upend markets in Europe led to angry protests in Belgium, Spain, Italy and France from taxi drivers who feared for their livelihoods." *The Guardian* reported how "[a]mid taxi strikes and riots in Paris, Kalanick ordered French executives to retaliate by encouraging Uber drivers to stage a counter-protest with mass civil disobedience" and, when "[w]arned that doing so risked putting Uber drivers at risk of attacks from" violent extremists "who had infiltrated the taxi protests and were 'spoiling for a fight', Kalanick appeared to urge his team to press ahead regardless[,]" stating: "I think it's worth it . . . . Violence guarantee[s] success. And these guys must be resisted, no? Agreed that right place and time must be thought out."

45.    *The Guardian* reported that "[t]he decision to send Uber drivers into potentially volatile protests, despite the risks, was consistent with what one senior former executive told the Guardian was a strategy of 'weaponising' drivers, and exploiting violence against them to 'keep the controversy burning'."  According to *The Guardian*, such conduct "was a playbook that, leaked emails suggest, was repeated in Italy, Belgium, Spain, Switzerland and the Netherlands." For example, "[d]river victims were encouraged to file police reports, which were shared with De

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Telegraaf, the leading Dutch daily newspaper."  One Uber manager reportedly wrote that these reports "will be published without our fingerprint on the front page tomorrow" and "[w]e keep the violence narrative going for a few days, before we offer the solution."  *The Guardian* also reported that "Uber drivers were undoubtedly the target of vicious assaults and sometimes murders by furious taxi drivers."

46.     Finally, *The Guardian* reported that "Uber executives and staffers appear to have been in little doubt about the often rogue nature of their own operation."  For example, *The Guardian* cited leaked internal emails where "staff referred to Uber's 'other than legal status', or other forms of active non-compliance with regulations, in countries including Turkey, South Africa, Spain, the Czech Republic, Sweden, France, Germany, and Russia."  One senior Uber executive reportedly wrote in an email that because "[w]e are not legal in many countries, we should avoid making antagonistic statements[,]" while another Uber executive wrote "[w]e have officially become pirates" while commenting on Uber's preparations to "avoid enforcement".  Moreover, Nairi Hourdajian, Uber's head of global communications, reportedly stated in a 2014 message to a colleague, amidst efforts to shut down the Company in Thailand and India: "Sometimes we have problems because, well, we're just fucking illegal."

47.     On this news, Uber's stock price fell $1.15 per share, or 5.15%, to close at $21.19 per share on July 11, 2022.

48.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

49.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or

otherwise acquired Uber common stock during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

50.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Uber common stock was actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Uber or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

51.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

52.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

53.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Uber;

- whether the Individual Defendants caused Uber to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Uber common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

54.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

55.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Uber  common stock is traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

19

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

- Plaintiff and members of the Class purchased, acquired and/or sold Uber common stock between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

56.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

57.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## **COUNT I**

### **(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

58.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

59.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

60.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud

in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Uber common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Uber common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

61.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Uber common stock.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Uber's finances and business prospects.

62.     By virtue of their positions at Uber, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

63.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

and/or directors of Uber, the Individual Defendants had knowledge of the details of Uber's internal affairs.

64.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.   Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Uber.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Uber's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Uber common stock was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Uber's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Uber common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

65.     During the Class Period, Uber common stock was traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Uber common stock at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Uber common stock was substantially lower than the prices paid

22

by Plaintiff and the other members of the Class. The market price of Uber common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

66. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

67. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## <u>COUNT II</u>

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

68. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

69. During the Class Period, the Individual Defendants participated in the operation and management of Uber, and conducted and participated, directly and indirectly, in the conduct of Uber's business affairs. Because of their senior positions, they knew the adverse non-public information about Uber's misstatement of income and expenses and false financial statements.

70. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Uber's financial condition and results of operations, and to correct promptly any public statements issued by Uber which had become materially false or misleading.

71.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Uber disseminated in the marketplace during the Class Period concerning Uber's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Uber to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Uber within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Uber common stock.

72.     Each of the Individual Defendants, therefore, acted as a controlling person of Uber. By reason of their senior management positions and/or being directors of Uber, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Uber to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Uber and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

73.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Uber.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

### DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  August 16, 2022

Respectfully submitted,

POMERANTZ LLP

*/s/ Jennifer Pafiti*

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

POMERANTZ LLP
Jeremy A. Lieberman
(*pro hac vice* application forthcoming)
J. Alexander Hood II
(*pro hac vice* application forthcoming)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
ahood@pomlaw.com

*Attorneys for Plaintiff*

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS