**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Lead Counsel for Lead Plaintiff and the Class*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| DONGPING CAO, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>UBER TECHNOLOGIES, INC., DARA KHOSROWSHAHI, and NELSON CHAI,<br><br>Defendants. | ) | Case No. 4:22-cv-04688-YGR<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>CLASS ACTION<br><br>Judge: Yvonne Gonzalez Rogers<br>Jury Trial Demanded |

Lead Plaintiff Robert Long, and named plaintiffs Anthony Schaar and Paul Mankabadi ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through their attorneys, which included, among other things, a review of the Defendants' public documents, announcements, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Uber Technologies, Inc. ("Uber" or the "Company"), and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set

forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Uber common stock between June 4, 2019 and July 10, 2022, inclusive (the "Class Period"). Plaintiffs seek to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

2. Travis Kalanick and Garrett Camp founded Uber in 2009 as a technology company designed to allow smartphone users to hail a car for a taxi ride using an app. From its origins in San Francisco, Uber quickly spread to other cities in the United States and around the world. With Kalanick as CEO, Uber pursued an aggressive, confrontational strategy with respect to taxi regulations that often left Uber in a legal grey area or outright banned their business practices. Uber fought tooth and nail to dodge regulators, including by designing a "kill switch" to allow Uber HQ to lock out computers at Uber's various satellite offices so as to prevent regulators from gaining access to information about its business.

3. Uber also aggressively pursued tax avoidance strategies, routing all of its payments to drivers in non US locations through its Amsterdam subsidiary, in an effort to avoid paying taxes in other jurisdictions and shielding its financial information from regulators in other countries. To ensure that the Netherlands would remain a friendly tax jurisdiction, Uber fostered an illicit relationship with Nellie Kroes, a former EU regulator, who secretly lobbied the Dutch government on Uber's behalf, despite Kroes being in a "cooling off period" where she was not permitted to engage in lobbying work. Kalanick also directed Uber to use the kill switch to obstruct an investigation by Dutch authorities. Uber's tactics in this area paid off when other European countries attempted to obtain tax information from the Dutch in order to investigate whether Uber was avoiding taxes. Dutch authorities delayed other investigators and gave Uber time to mount a response.

4. Due to various scandals involving Uber, in 2017 Kalanick was forced to resign. He was replaced by a new management team, led by Dara Khosrowshahi as CEO, and Nelson

Chai as CFO. Khosrowshahi came in with a mandate to turn around Uber's culture, and get the company ready for an IPO, which Uber ultimately launched in 2019. However, despite claims to have turned the company around, Uber concealed its use of its Netherlands subsidiary as a tax shelter, and the illicit efforts to preserve that status. Despite its obligation to report "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting" Khosrowshahi and Chai failed to report that Kalanick, who during his time as CEO was charged with overseeing Uber's internal control over financial reporting, himself obstructed justice in the Netherlands by ordering the use of the "kill switch." In addition, when asked on a conference call about the importance of Uber's Netherlands operations as a tax haven, Khosrowshahi falsely claimed that, rather than using the Netherlands as a tax haven, it headquartered its operations there for personnel rather than tax reasons.

5. The truth came to light on July 10 and 11, 2022, when the Guardian and the International Consortium of Investigative Journalists published a series of articles based on a trove of internal Uber documents revealing Uber's misconduct. They received these documents from Uber's former chief lobbyist for Europe, Mark MacGann. As a result of the revelation of the fraud, Uber's stock fell $1.15 per share, or 5%, to close at $21.19 per share on July 11, 2022.

## **JURISDICTION AND VENUE**

6. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

7. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

8. Venue is proper in this judicial district pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as the alleged misstatements entered and the subsequent damages took place in this judicial district. Further, the Company maintains an office in San Francisco.

9. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants (defined below), directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

10. Lead Plaintiff Robert Long, as set forth in his previously filed Certification (Dkt. No. 8-1), purchased the Company's common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

11. Plaintiff Anthony Schaar as set forth in his certification attached hereto as Exhibit 1, purchased the Company's common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

12. Plaintiff Paul Mankabadi, as set forth in his certification attached hereto as Exhibit 2, purchased the Company's common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

13. Defendant Uber is a Delaware corporation with its principal executive offices at 1455 Market Street, 4th Floor, San Francisco, California 94103 Uber's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "UBER."

14. Defendant Dara Khosrowshahi ("Khosrowshahi") has served as the Chief Executive Officer, President, and Chairman of Uber throughout the Class Period. He has served as Chief Executive Officer and as a member of the board of directors since September 2017.

15. Defendant Nelson Chai ("Chai") has served as the Chief Financial Officer of Uber since September 2018.

16. Defendants Khosrowshahi and Chai are sometimes referred to herein as the "Individual Defendants."

17. The Individual Defendants:

(a) directly participated in the management of the Company;

(b) were directly involved in the day-to-day operations of the Company at the highest levels;

(c) were privy to confidential proprietary information concerning the Company and its business and operations;

(d) were directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) were directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) were aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

18. The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

19. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

20. The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## **COMPANY BACKGROUND**

21. Garrett Camp, a computer programmer, and Travis Kalanick, a serial entrepreneur, founded Uber together in 2009, under the name Ubercab. They founded the company due to the inconvenience of trying to find a cab in San Francisco. Their solution was to design an app that allowed a person to order and pay for a private car ride from a smartphone app. The company initially hired Ryan Graves, then 27, as CEO in 2010 but later that year Kalanick succeeded him, and Graves became a Senior Vice President In the following years Uber raised significant venture capital funds and expanded rapidly, particularly after Uber launched UberX, which instead of using luxury "Black Cars", allowed drivers to use a wider

variety of cars, including their personal vehicles. Uber subsequently launched UberEats, a food delivery service, as well as courier, package delivery, and freight transportation services.

22. Due to the highly regulated nature of the taxi industry, and the unprecedented nature of Uber's business, in many cities and foreign countries Uber's business operated in a legal grey area or was outright illegal. Rather than wait on regulatory change, Uber aggressively moved into new markets where regulations were ambiguous or even where they outright banned Uber, and used a variety of aggressive tactics to avoid regulatory sanction. For instance, through an app called "Greyball" they identified Uber accounts belonging to regulators who were attempting to use the app to catch and fine Uber drivers for operating unlicensed taxis. Uber would flag those regulator accounts and prevent them from actually booking an Uber ride, so that the regulators would be unable to actually issue fines to drivers. Uber also advised drivers to ignore government regulations. In California, Uber told drivers to pick up passengers at airports despite the fact that California airports forbade the practice. Uber informed drivers that they would cover their fines.

23. Uber also applied its hard-nosed tactics against class action plaintiffs. When an Uber customer brought a class action lawsuit against the company, alleging that its surge pricing policies violated antitrust law, Uber hired private investigators to investigate the plaintiff's lawyer and his firm, contacting the lawyer's friends, as well as acquaintances of the client, operating under pretexts and claiming that they were profiling up and coming lawyers. Uber's lawyers at the time initially denied any involvement, but later called and admitted that Uber executives had hired a secretive research firm staffed by former employees of the CIA and NSA to investigate the lawyer.

24. Under Kalanick, Uber also fostered a toxic culture. On February 19, 2017, Susan Fowler, a former engineer at Uber, revealed on her personal website that a manager at Uber propositioned her for sex, and that another manager threatened to terminate her if she reported the incident. Uber's board launched an internal investigation and fired 20 employees in June of 2017. At that point, Kalanick took an indefinite leave of absence and then resigned shortly thereafter. Uber then conducted a search for a new CEO and after looking at several candidates

settled on Khosrowshahi as CEO.

25. As the New York Times described, in a May 3, 2019 article titled "With Uber's I.P.O., Dara Khosrowshahi Is Taking Travis Kalanick's Company Public", described: "When Mr. Khosrowshahi took over as chief executive of Uber in 2017, he became the best-compensated janitor in Silicon Valley, with a mandate to clean up the mess left by the company's exiled founder." In order to help clean up the company "Khosrowshahi hired a slew of lawyers to plumb and correct years of the company's legal deficiencies."

26. In addition to addressing all of the legal, cultural, and reputational issues left behind by Kalanick, Khosrowshahi came on as CEO with a mandate to launch a successful IPO. According to Uber's S-1 Registration Statement filed on April 11, 2019, Khosrowshahi's compensation package included a large set of options that vested if Khosrowshahi could take Uber public for a valuation of $120 billion, and if he could maintain that valuation for 90 days. According to Business Insider, in an article dated April 16, 2019, that option package was worth more than $100 million.

27. According to testimony in the criminal trial of Joseph Sullivan, a former Uber executive, in 2017 the board of directors formed a "Special Matters Committee" to investigate "allegations that had been made regarding the company" under Kalanick's tenure. The board also retained the law firms WilmerHale and Cooley to conduct an independent investigation. The board formed the committee even before Khosrowshahi came on as CEO, but when he joined the company he began attending meetings of the Special Matters Committee. At the same time, Khosrowshahi prepared the company for an IPO.

28. Among the allegations "that had been made regarding the company" was the accusation that the company had created a "kill switch" to block access to computers at their various offices and thereby thwart investigators who were looking into the company. Bloomberg News reported on January 11, 2018 that a team at Uber HQ created a system called "Ripley" which was designed to thwart police raids in foreign countries by disconnecting computers at Uber's satellite offices from their servers. Bloomberg relied on three anonymous sources for its reporting. According to the article Uber used this software to thwart government

raids in Montreal, Amsterdam, Brussels, Hong Kong, and Paris. The story also quoted a denial from Uber: "'Like every company with offices around the world, we have security procedures in place to protect corporate and customer data,' Uber said in a statement. 'When it comes to government investigations, it's our policy to cooperate with all valid searches and requests for data.'"

**The Uber Files**

29. On July 10th and 11th, 2022, the Investigative Consortium of Investigative Journalists ("ICIJ"), a nonprofit network of journalists based in Washington D.C., and the newspaper The Guardian published a series of articles under the umbrella title of "The Uber Files". As the ICIJ explained, the Uber Files "is based on a leak of sensitive texts, emails, invoices, briefing notes, presentations and other documents exchanged by top Uber executives, government bureaucrats and world leaders in nearly 30 countries." The ICIJ explained that Uber "held undisclosed meetings with politicians to ask for favors, including dropping probes and changing policies on workers' rights; that the company used Russian oligarchs as conduits to the Kremlin; and that it discussed the public relations benefits of violence against its drivers as it engaged in international power struggles with taxi drivers and legislators opposed to its expansion." The "the public relations benefits of violence against its drivers" refers to Kalanick's comment in an internal email that, if Uber drivers are attacked by protestors, it would help Uber because "violence guarantee[s] success". The Uber files also shows how Uber saved millions of dollars in taxes by routing profits through Bermuda and other offshore locations. On July 11, the whistleblower who provided the Uber Files to the Guardian came forward. His name was Marc MacGann, and served as Uber's chief lobbyist for Europe, the Middle East and Africa from 2014 to 2016. In total, he provided more than 124,000 emails, text messages, and other documents to the Guardian.

30. The files also showed that Uber's kill switch was used extensively and authorized at Uber's highest levels. According to the Guardian's reporting, Uber used the kill switch at least 12 times in at least six countries in the period from 2013 to 2017. When using the kill switch in Paris during a raid, Uber executives feigned confusion as officers demanded to see

their data. Among the executives who ordered the use of the kill switch were Travis Kalanick, during his time as CEO, Zac de Kievit, Uber's former legal director in Europe, and Pierre-Dimitri Gore-Coty, who remains an executive at Uber. Abandoning its previous denials, when the Guardian reported on the full extent of the kill switch, including the fact that Kalanick authorized its use, Uber issued a statement that acknowledged that it was used to thwart government investigations. According to the Guardian, "Uber's spokesperson said its kill switch software 'should never have been used to thwart legitimate regulatory action' and it had stopped using the system in 2017, when Khosrowshahi replaced Kalanick as CEO."

31. The Uber Files also revealed that Uber worked aggressively to avoid taxes, in part by centering its European operations in the Netherland, which it used as a tax shelter.

32. According to the Uber Files, Uber set up a subsidiary, Uber B.V., in the Netherlands, shortly after it launched operations in Europe. Uber routed international payments for rides through its Dutch subsidiary to another subsidiary in Bermuda that held Uber's patents. Uber did this to avoid paying taxes in other jurisdictions, particularly in Europe. Ahead of Uber's IPO, in 2019, Uber wound down its Bermuda subsidiary, but in doing so made sure that its Netherlands subsidiary was even more substantial. Uber's Netherlands subsidiary purchased Uber's Bermuda subsidiary's intellectual property, using a loan from Uber's Singapore subsidiary. Uber, however, structured the loan from Singapore to reduce its taxable income in the Netherland by $1 billion per year for 20 years.

33. To preserve its tax status in the Netherlands, Uber went so far as to force the resignation of a highly valued London based executive because he refused to move to Amsterdam. Fraser Robinson, a London based uber executive, who successfully negotiated a $3.5 billion investment from Saudi Arabia, worked from London in 2016. At the time, Uber was attempting to persuade UK tax authorities that the company was not being managed, even in part, from the UK, and that therefore it did not owe any UK taxes. Therefore, they instructed Robinson to move to Amsterdam, where Uber International's headquarters are located. Despite the fact that he was described internally as someone who "spearheaded some of the company's most transformational deals", Uber refused to let him operate out of the UK and he was forced

to resign.

34. To further shore up its position in the Netherlands, Uber secretly employed former EU vice president Neelie Kroes, who in 2015 lobbied the Dutch Prime Minister, despite officially being in a "cooling off period" of 18 months during which she was not supposed to engage in lobbying work after her departure from working for the EU. Immediately after the end of her cooling off period, in May 2016, she officially joined Uber's public policy advisory board, for which Uber paid her $200k per year. However, she had already agreed to join the advisory board by September 25, 2014, with Mark MacGann emailing a colleague that "We are getting Neelie Kroes to join our advisory board (mega confi[dential])". Uber executives kept her work for them in 2015 secret, with MacGann admonishing a colleague in March of 2015 that "[h]er name should never figure on a document whether internal or external. We have a specific relationship with Neelie Kroes right now, which is sensitive and highly confidential.". At the same time, in January of 2015, the Dutch government appointed her special envoy for startup companies. In March 26, 2015, Dutch police raided Uber's Amsterdam office to investigate whether Uber was breaking Dutch Taxi law by operating the UberPop service. Within two hours after the raid commenced, MacGann emailed Kalanick and stated that "Neelie Kroes calling minister of economy [Henk Kamp] now and other members of the government to force regulator and police to back off,". MacGann also stated that Kroes spoke to Dutch Minister for infrastructure and the environment Melanie Schultz. On April 2, MacGann told other Uber executives that Kroes had contacted Schultz again and "harassed" Siebe Riedstra, a top official at the ministry for infrastructure and the environment. Ridedstra confirmed to the Guardian that "[Kroes] explained the problem of Uber and asked me who is responsible," and that "[s]he was clear about being connected to Uber".

35. Uber's lobbying of the Dutch government paid off in the form of extraordinary cooperation from Dutch tax authorities. In 2015, tax authorities from France, Germany, Sweden, the UK and Belgium contacted Dutch authorities for detailed driver records so that the various national tax authorities could assess taxes on Uber drivers. Uber relied on Dutch authorities to buy it time. Uber international tax manager Rob van der Woude sent an email

saying "[t]he Dutch tax authorities are trying to slow down the sharing of information and will likely do the same should new requests by other countries come up". After an April meeting between the Dutch tax authorities and Uber executives in San Francisco, van der Woude emailed "This relationship is of great importance and value in light of our corporate structure and tax effectiveness …. The Dutch tax authorities have been collaborative and defensive of us." At the time, several EU countries were investigating whether Uber was failing to pay income and value-added taxes in various EU countries, van der Woud commented that "This will be an important battle we need the [Dutch tax authorities] to fight for us". Eventually, Uber managers decided to comply with the information request by the various European countries' authorities but van der Woud noted that the Dutch stalling tactics had given Uber enough time to "get our affairs in order." In December 2015, van der Woulde told colleagues that the Dutch tax office had assured him that the countries who were auditing Uber would "not take a punitive approach" to collect tax from drivers, and also agreed not to tell the drivers that Uber turned information about drivers over to tax authorities.

**Materially False and Misleading Statements**

36. On June 4, 2019, Uber issued a quarterly report on form 10-Q (the "Q1 2019 Quarterly Report"). The Q1 2019 Quarterly Report was signed by Defendants Khosrowshahi and Chai and incorporated financial information from 2017 through 2019. Accompanying the Q1 2019 Quarterly Report are certifications required by the Sarbanes Oxley Act, signed by Defendants Khosrowshahi and Chai. The Q2 2019 Quarterly Report's Certifications stated, in pertinent part:

> The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
>
> …
>
> (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

37. The foregoing statement is misleading because Uber failed to disclose fraud that involves a member of management with a significant role in the registrant's internal control over financial reporting – specifically that Travis Kalanick, who was Uber's CEO in 2016 and 2017, and therefore had a significant role in Uber's internal control over financial reporting, engaged in fraudulent conduct when he ordered the use of the "kill switch" to obstruct an investigation by Dutch taxi authorities.

38. On August 9, 2019, Uber issued a quarterly report on form 10-Q (the "Q2 2019 Quarterly Report"). The Q2 2019 Quarterly Report was signed by Defendants Khosrowshahi and Chai and incorporated financial information from 2017 through 2019. Accompanying the Q2 2019 Quarterly Report are certifications required by the Sarbanes Oxley Act, signed by Defendants Khosrowshahi and Chai. The Q2 2019 Quarterly Report's Certifications stated the following, in pertinent part:

> The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
>
> …
>
> (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

39. The foregoing statement is misleading because Uber failed to disclose fraud that involves a member of management with a significant role in the registrant's internal control over financial reporting – specifically that Travis Kalanick, who was Uber's CEO in 2016 and 2017, and therefore had a significant role in Uber's internal control over financial reporting, engaged in fraudulent conduct when he ordered the use of the "kill switch" to obstruct an investigation by Dutch taxi authorities.

40. On November 5, 2019, Uber issued a quarterly report on form 10-Q (the "Q3 2019 Quarterly Report"). The Q3 2019 Quarterly Report was signed by Defendants Khosrowshahi and Chai and incorporated financial information from 2017 through 2019.

Accompanying the Q3 2019 Quarterly Report are certifications required by the Sarbanes Oxley Act, signed by Defendants Khosrowshahi and Chai. The Q2 2019 Quarterly Report's Certifications stated the following, in pertinent part:

> The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
>
> …
>
> (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

41. The foregoing statement is misleading because Uber failed to disclose fraud that involves a member of management with a significant role in the registrant's internal control over financial reporting – specifically that Travis Kalanick, who was Uber's CEO in 2016 and 2017, and therefore had a significant role in Uber's internal control over financial reporting, engaged in fraudulent conduct when he ordered the use of the "kill switch" to obstruct an investigation by Dutch taxi authorities.

42. On March 2, 2020, Uber issued an Annual report on form 10-K (the "2019 Annual Report"). The 2019 Annual Report was signed by Defendants Khosrowshahi and Chai and incorporated financial information from 2015 through 2019. Accompanying the 2019 Annual Report are certifications required by the Sarbanes Oxley Act, signed by Defendants Khosrowshahi and Chai. The 2019 Annual Report stated the following, in pertinent part:

> The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
>
> …
>
> (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

43. The foregoing statement is misleading because Uber failed to disclose fraud that involves a member of management with a significant role in the registrant's internal control over financial reporting – specifically that Travis Kalanick, who was Uber's CEO in 2016 and 2017, and therefore had a significant role in Uber's internal control over financial reporting, engaged in fraudulent conduct when he ordered the use of the "kill switch" to obstruct an investigation by Dutch taxi authorities.

44. On May 11, 2020, at Uber's Annual General Meeting, Defendant Khosrowshahi responded to the following question, read by Tony West, Uber's Chief Legal Officer.

> Mark asks it is highly likely that the impending economic and societal crisis will force a previously unlikely harmonization of corporate taxation levels, if not globally and certainly within the European Union. Uber chose Amsterdam to base its international operations, in large part for a highly advantageous corporate taxation arrangement totally legal, which has a direct and substantial impact on earnings and profitability what are the plans to adapt to the new world reality subsequent to the public health crisis and the ensuing financial economic and societal crisis? …
>
> Dara Khosrowshahi, Chief Executive Officer, Director
>
> Yeah. Thank you, Mark. I guess I'd say we have our Amsterdam office for many factors. Very important amongst them is the talent there, we've got, we've got a great employee base there across many different factors of our operation, and it remains and it will be a very important part of our talent base going forward. And the basis is more than tax, it's many things especially access to great employees up as far as adapting to the new world of reality. I will tell you that our priority right now is safety and how do you guarantee or guarantee as much as you can. The safety of our riders, drivers, couriers, eaters, restaurant partners in this new world reality? As far as corporate taxation structures, local presence, et cetera. We are consistently looking at these factors, we have a team that is deeply experienced in these areas and we are making sure that we structure the business to be local, locally relevant to make sure that we are participating in local economies, and I think what's a little different about Uber than many of what, say, the other digital companies out there is that the vast majority of the monies that are flowing through our system state, local, right. They go through, they go from our riders to our drivers and the money flows very much are kind of different from the typical money flows of other companies out there. So that said, right now, safety is job number one, and we have a team that is thinking about kind of new world realities and structures, very much on a daily basis going forward.

45. The foregoing statement was materially misleading for failing to disclose that

Uber in fact headquartered its European operations in Amsterdam in order to use the Netherlands as a tax shelter, and because the Dutch tax authorities assisted Uber in avoiding European taxes by delaying its responses to other European tax authorities, and failed to take action against Uber even when then-CEO Travis Kalanick ordered the use of the "kill switch" to obstruct Dutch authorities from obtaining Uber's records.

46. On March 1, 2021, Uber issued an annual report on form 10-K (the "2020 Annual Report"). The 2020 Annual Report was signed by Defendants Khosrowshahi and Chai and incorporated financial information from 2016 through 2020. Accompanying the 2020 Annual Report are certifications required by the Sarbanes Oxley Act, signed by Defendants Khosrowshahi and Chai. The 2020 Annual Report's Certifications stated the following, in pertinent part:

> The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
>
> …
>
> (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

47. The foregoing statement is misleading because Uber failed to disclose fraud that involves a member of management with a significant role in the registrant's internal control over financial reporting – specifically that Travis Kalanick, who was Uber's CEO in 2016 and 2017, and therefore had a significant role in Uber's internal control over financial reporting, engaged in fraudulent conduct when he ordered the use of the "kill switch" to obstruct an investigation by Dutch taxi authorities.

**<u>The Truth Emerges</u>**

48. On July 10, 2022, the newspaper The Guardian and the ICIJ website published several articles based on the Uber files. The Guardian published an article titled "Uber bosses told staff to use 'kill switch' during raids to stop police seeing data". It stated

Senior executives at Uber ordered the use of a "kill switch" to prevent police and regulators from accessing sensitive data during raids on its offices in at least six countries, leaked files reveal.

The instructions to block authorities from accessing its IT systems were part of a sophisticated global operation by the Silicon Valley company to thwart law enforcement.

The Uber files, a cache of confidential company data leaked to the Guardian, reveal how the company deployed its kill switch at least 12 times in France, the Netherlands, Belgium, India, Hungary and Romania.

Uber developed its kill switch systems in the midst of a flurry of raids by police and officials, who were gathering evidence that could be used to shut down Uber's unlicensed taxi service, impound vehicles or prosecute drivers.

During one raid in Paris, the leak shows Uber executives pretending to "appear confused" as officers circled their desk demanding to see data. They discussed shutting down office access to the company's main IT systems while simultaneously watching police searching computers for evidence.

Legal experts said the actions documented in the data raised questions about possible breaches of laws against obstructing justice in France, the Netherlands, India and Hungary.

While it was known that Uber had used a kill switch system in some countries, including Canada and Hong Kong, the leaked files reveal its use was more extensive than previously known – and show how it was executed with the involvement of senior executives.

Emails show both Travis Kalanick, Uber's former chief executive, and Zac de Kievit, its former legal director in Europe, instructing IT staff to "kill" access to computer systems. Similar instructions were issued by Pierre-Dimitri Gore-Coty, who is still part of Uber's 11-strong executive team.

Uber said its software "should never have been used to thwart legitimate regulatory action". A spokesperson for Kalanick, who stepped down as chief executive in 2017, said the kill switch was not used to obstruct justice in any country. She said Kalanick had never been charged in any jurisdiction for obstruction of justice or any related offence.

**'The police won't be able to get much'**

The earliest mention of the use of a kill switch in the Uber files relates to two raids in France in late 2014.

On 17 November, following months of simmering anger from traditional taxi services, who felt Uber's unlicensed ride-sharing model was unfair competition,

officials from the competition regulator, the DGCCRF, swooped on Uber's French HQ in a business park in the 19th arrondissement of Paris.

Already on alert after a raid in Lyon three days earlier, the company acted fast.

In a message sent at 3.14pm, apparently after the raid had begun, De Kievit emailed an Uber IT engineer in Denmark, saying: "Please kill access now," copying in executives including Kalanick and Gore-Coty, who ran Uber's operations in western Europe.

Thirteen minutes later, the technician wrote back, confirming the procedure was "done now".

This approach to what staff called "unexpected visitors" would evolve the following year after a raid in Brussels by police investigating Uber's use of regular drivers without a cab licence, a service known at the time as UberPop.

Belgian authorities wanted to obtain company data about drivers, which was held on servers in the US, documents show. Eight armed officers wearing bulletproof vests descended on the Brussels office unannounced on 12 March 2015, accompanied by half a dozen IT experts.

Unlike in France, police took steps to ensure local staff could not communicate with Uber HQ back in San Francisco during the raid. Later that day, De Kievit emailed executives, including Kalanick: "Our team were detained and did not have an opportunity to raise the kill switch."

Nonetheless, Uber bosses appear to have approved an alternative method of trying to restrict what police might find. Kalanick, Gore-Coty and Uber's lawyers were copied into emails in which senior IT engineers discussed cutting access to laptops that had already been confiscated.

In one message, a senior technician told Uber's chief lobbyist in Europe, Mark MacGann, that he had done this via an administrative system called Casper. "Lock has been initiated on the machines that were seized," he wrote.

Later that year, a Belgian court order forced Uber to suspend its unlicensed UberPop service in the country. But Uber executives had learned a valuable lesson from the experience, emails exchanged among executives show.

Four days after the Brussels raid, officers from France's "Boers" police unit, whose job it was to detect fake taxis, swarmed into the Paris office via two different doors. Uber's lawyers were prevented from entering the premises.

By then, Uber had "heightened our preparedness" in the light of what happened in Brussels, according to an email sent from MacGann to David Plouffe, Uber's head of policy and strategy, after the raid.

"Access to IT tools was cut immediately, so the police won't be able to get much if anything," he reported. A source present that day recalls computer screens simply went black seconds after police arrived in the office, as if they had been powered down.

The following month, during the second of two raids in Amsterdam by the Dutch transport authority the ILT, top executives took charge of the kill switch strategy.At 9.25am, Gore-Coty emailed the same technician in Denmark who had cut access in Paris the year before, ordering him to repeat the trick. Seven minutes after Gore-Coty's email, Kalanick followed up, copying in Uber's lawyers: "Please hit the kill switch ASAP … Access must be shut down in AMS [Amsterdam]."

Amsterdam was Uber's European HQ and it had to be defended at all costs. Fortunately for Uber, it had not only fine-tuned its protocols since Brussels, but learned to predict raids and prepare accordingly.

Weeks earlier, De Kievit had told senior colleagues that raids were likely and that the company had hired an "off-site storage facility and moved all of our paper there". A list of everyone in the office had been compiled "to ensure an IT kill gets everyone".

De Kievit was taken into custody and questioned about his role in cutting IT access. He was fined €750 for non-compliance with an official order, according to the Amsterdam public prosecutor.

**'Try a few laptops, appear confused'**

But senior staff were hailing the lawyer's approach by the time of another raid, in Paris, on 6 July 2015. The arrival of about 20 police and officials from France's tax inspectorate, shortly before 8am, prompted a flurry of text messages among senior staff about how to dupe them.

Thibaud Simphal, then the manager of Uber France, and now the company's global head of sustainability, took to his phone and kept MacGann and De Kievit informed.

MacGann told him: "Use the 'Zachary De Kievit' playbook: try a few laptops, appear confused when you cannot get access, say that IT team is in SF [San Francisco] and fast asleep, and anyway this is all controlled by [Dutch parent company] Uber BV so they should write to Uber BV with their request."

Simphal responded: "Oh yeah we've used that playbook so many times by now the most difficult part is continuing to act surprised!"

As investigators began searching laptops, executives fired dozens of messages back and forth, discussing how to secretly hamper their efforts.

At 8.34am, Simphal realised that access to Gore-Coty's computer had not been cut and that any investigator could still access internal systems unless something was done. "Pierre, try and close that single tab if you can," he texted. Minutes later, at 8.38am, De Kievit confirmed he was working with colleagues "re P's computer".

But Simphal could only watch as police examined the laptop, asking colleagues: "Why is it not cut? They're browsing his [Google] drive." Police had by then gained access to "very sensitive data", he warned, adding that they "don't seem to know what they're looking for".

The messages suggest police warned staff that they could be taken into custody if laptops were blocked, yet the conversation about how to impede the investigation appears to have continued.

"I would give them access to the computer but in the background we cut access to cloud," De Kievit wrote at 8.57am. Two minutes later, a Paris employee confirmed that "access has been cut for Pierre". "I'm next, so make sure my login is cut," he added.

In a statement, Uber said it had stopped using the kill switch in 2017, when Dara Khosrowshahi replaced Kalanick as chief executive and overhauled its corporate culture. MacGann said: "On every occasion where I was personally involved in 'kill switch' activities, I was acting on the express orders from my management in San Francisco."

Simphal did not respond directly to questions about the use of a kill switch but said Uber's problems with regulators and law enforcement came during "very difficult periods" that also proved to be "learning experiences". De Kievit did not return a request for comment.

A spokesperson for Kalanick said the kill switch was "not designed or implemented to obstruct justice". She said it was used to "protect intellectual property and the privacy of […] customers, and ensure due process rights are respected in the event of an extrajudicial raid".

His lawyers said because no data was permanently deleted in the process, authorities could still obtain it later.

The spokesperson said Kalanick did not oversee the systems, which did not involve data deletion and were approved by Uber's lawyers. Kalanick "has never been charged in any jurisdiction for obstruction of justice or any related offence," she added.

Gore-Coty, who now runs the food delivery service Uber Eats, told the Guardian he regretted some of Uber's tactics, which led to him being fined €30,000 in 2016 for running an illegal taxi service, a decision that was upheld on appeal earlier this year. The case, in which Uber, Gore-Coty and Simphal are

defendants, is subject to a new appeal to the French supreme court. At the time the kill switch was used, Gore-Coty said, he was "young and inexperienced and too often took direction from superiors with questionable ethics".

49. Also on July 10, 2022, the Guardian published an article titled "Former EU digital chief secretly helped Uber lobby Dutch PM, leak suggests":

> The European Commission is facing calls to launch an inquiry into its former vice-president Neelie Kroes, after leaked files suggested she secretly helped Uber lobby the Netherlands prime minister, Mark Rutte, and a string of other national Dutch politicians.
>
> Uber considered its relationship with Kroes so sensitive that the company's top European lobbyist repeatedly instructed colleagues to keep it hidden, warning in 2015 that it was "highly confidential and should not be discussed outside this group".
>
> Kroes says she did nothing wrong, adding that her role as a special envoy for tech companies meant it was her job to speak to politicians about nascent firms in the sector. But transparency experts said the covert help Kroes seemingly provided the cab-hailing app – which was under criminal investigation in the Netherlands at that time – may have breached EU ethics rules.
>
> "This case should be urgently investigated so that lessons can be learned," said Vicky Cann, at the Corporate Europe Observatory, a Brussels NGO that monitors lobbying.
>
> The details of Kroes secretly assisting the California tech group are contained within the Uber files, a hoard of 124,000 records leaked to the Guardian and shared with the International Consortium of Investigative Journalists and media partners in 30 countries.
>
> The data appears to show Kroes, who had been the EU's top official on internet policy, offering to arrange a series of meetings for Uber during her 18-month "cooling-off period" after leaving the commission.The cooling-off period aims to reduce conflicts of interest by restricting the jobs commissioners can take once they have stepped down. In Kroes's case it ran from November 2014 until May 2016, when it was announced she was joining Uber's public policy advisory board. For this, she was paid $200,000 a year, the documents suggest.
>
> Despite a commission ban on taking that role before May 2016, Kroes spoke to Dutch government ministers about Uber and offered to set up talks with senior EU officials, according to the leaked files.
>
> And when Uber's Amsterdam headquarters were raided by police in the spring of 2015, Kroes called Dutch government ministers to get regulators to "back off" as she "harassed" a top civil servant, internal Uber emails claim.

**'Mega-confidential'**

Uber's desire to have Kroes onboard was understandable. She was one of the EU's most powerful policymakers, and a fan of the cab-hailing service.

As a serving commissioner in April 2014, Kroes put her name to a strident blogpost attacking a decision by a Brussels court to ban the app, describing the move as "crazy" and designed to protect "a taxi cartel".

In email exchanges, Uber executives made clear they did not want her 10-year stint as European commissioner to end in October 2014 – with the company's then top European lobbyist, Mark MacGann, writing in September of that year: "Frankly I can't count on her successor to be of any help."

But the leaked correspondence also shows how Uber was already planning a future that would include Kroes. "We are getting Neelie Kroes to join our advisory board (mega confi[dential])," MacGann wrote to another Uber executive on 25 September 2014.

The plan would take some time to come to fruition and, separately, the Dutch politician took on a different role.

In January 2015, the Dutch government unveiled her as its special envoy for startup companies, after the commission granted special permission for Kroes to take up the ambassadorial post. She remained bound by standard commission commitments, however, such as acting with "integrity and discretion".

While there may be a possible overlap with the startup role and companies such as Uber, it was clear at the time that Kroes's new position should focus solely on broad themes. The commission said it approved her appointment as "the activity did not concern individual companies specifically, but consisted in promoting a public interest in the Netherlands with possible wider positive effects for Europe as a whole".

Yet, during 2015 the politician appears to have played a central role in helping Uber in the Netherlands, with the relationship kept strictly on the downlow.

In March 2015, MacGann admonished a consultant who put Kroes's name on a document: "That was an error (understatement)," he wrote. "Her name should never figure on a document whether internal or external. We have a specific relationship with Neelie Kroes right now, which is sensitive and highly confidential."

Less than two weeks later, life at Uber was to get more sensitive still.

**Raided**

On 26 March 2015, Dutch police raided Uber's Amsterdam office as part of an

investigation into whether the company was breaking Netherlands taxi law by offering its UberPop service, which essentially allowed anybody with a driving licence to become a taxi driver for a few hours.

One hour and 34 minutes after the raid commenced, MacGann emailed other Uber executives, including the company's co-founder Travis Kalanick, the leaked records show. He claimed to colleagues that Kroes was making calls at his request.

"Neelie Kroes calling minister of economy [Henk Kamp] now and other members of the government to force regulator and police to back off," the email said. "We are being questioned now."

MacGann also reported that Kroes had spoken to Melanie Schultz, the minister for infrastructure and environment.

There were more slightly breathless exchanges days later when Uber's Amsterdam base was raided again, on 2 April 2015. This time, MacGann emailed Uber colleagues to tell them Kroes had contacted Schultz once more and "then harassed" the top civil servant at the ministry for infrastructure and environment, Siebe Riedstra.

"[Kroes] explained the problem of Uber and asked me who is responsible," Riedstra told the Guardian when recalling that conversation this month, although he denied he had been harassed. "She was clear about being connected to Uber," he added.

The documents continue to paint a picture of Kroes mucking in for the Californian company in the weeks following the raids. She was, MacGann promised colleagues on 22 April 2015, going "to explain [to Dutch officials] that we are willing to negotiate a settlement, to calm down enforcement and incentivise the transport ministry to get in a room with us". It is unclear whether Kroes raised these issues in her contacts with Dutch ministers.

He also returned to a familiar theme. "Her reputation and our ability to negotiate solutions in the Netherlands and elsewhere would suffer from any casual banter, inside or outside the office," he said.

**'I will do my utmost'**

All of this was critical for Uber as, despite being a geographically small country, the Netherlands was a symbolically important territory in the company's strategy. Like many US tech firms, it had located its international headquarters in Amsterdam, seemingly to pay lower taxes.

The company needed to be seen to be a success where its non-US operations were based, which elevated the significance of Kroes and her contacts – even the obviously elite ones.

Kroes helped Uber meet Rutte, a fellow member of the liberal People's Party for Freedom and Democracy, the Uber files record.

Emails imply that the pair of Dutch politicians had a close working relationship, with MacGann writing to an Uber colleague in March 2015 to relay how Kroes was "passing some messages for me this weekend to the Dutch PM".

Rutte seemed to offer some encouragement too. Notes taken at a subsequent meeting between the prime minister, Kalanick and Kroes in January 2016 suggest that Rutte told Kalanick: "I want you to grow." The trio then appeared together in a publicity photograph.

Transparency experts say the assistance outlined in the Uber files suggest Kroes may have breached EU ethics rules, which state how commissioners must "behave with integrity and discretion" when accepting jobs and benefits after ceasing to hold office.

Alberto Alemanno, an EU law professor at HEC Paris business school, added that Kroes's support for Uber appeared to represent a breach of the authorisation she obtained to be Dutch special envoy for startups.

Meanwhile, the files suggest Kroes appeared ready to organise meetings with two European commissioners for Uber, raising questions about whether she complied with the spirit of EU rules that ban lobbying during the cooling-off period.

The 2011 code of conduct said former commissioners were forbidden from lobbying the executive branch of the EU during an 18-month period after they stood down. Yet, in May 2015, Kroes appears to have suggested she might facilitate a meeting for the company with the transport commissioner, Violeta Bulc. "Violeta is travelling like hell," Kroes wrote to MacGann on 15 May 2015. "Let you know what is the new proposal."

Days before the cooling-off period ended, Kroes also promised to set up a meeting between Kalanick and the European Commission first vice-president, Frans Timmermans, who is also Dutch. "I will do my utmost for Frans," she wrote on 29 April 2016.

It is not clear whether the assistance Kroes appears to have offered Uber in relation to Dutch politicians, on the one hand, and European commissioners on the other, proved tremendously successful or materialised. Ultimately, after a four-year investigation into the company in the Netherlands, Uber settled the case in 2019 by paying a €2m fine to the Dutch authorities for breaching local laws by allowing its drivers to operate without a taxi licence.

Yet, there was a time when the cab-hailing app seemed to have valued the efforts

the former commissioner made on its behalf.

She has been "very generous" with her time and advice, while also facilitating "a number of high-level meetings," an internal Uber note in August 2015 recorded, which went on to mention how Kroes was then seeking commission approval to formally work for Uber before her cooling-off period expired.

Only, that approval never came.

**The Juncker refusal**

In November 2015, Uber and Kroes received an opinion from the commission's "ad hoc ethical committee" stating she should not work for the tech company before her 18-month cooling-off period ended in May 2016.

Less than a month later, Kroes tried another approach, this time seeking permission from the then commission president, Jean-Claude Juncker, to take up the role. He rejected her request, too, in a manner that riled Kroes.

"Incredible, very unpolite [sic]," she wrote to MacGann, suggesting – without providing evidence – that the president must have been drunk when he drafted his reply.

Yet, despite the ban on her taking a formal Uber role, the leaked files suggest she continued to assist the company in the background.

And the company remained sensitive about the former commissioner's reputation once she joined Uber in May 2016, the files suggest. In emails, Uber executives considered there to be a risk of Kroes becoming "the poster child for the discussions around 'revolving door/tech's crony capitalism'".

Responding to questions, Kroes denied she had behaved inappropriately. She said she served in the unpaid role as special envoy for startups at StartupDelta in the Netherlands from January 2015 to June 2016. "I was required to interact with a wide array of business, government and non-governmental entities, with the aim to promote a business-friendly and welcoming ecosystem in the Netherlands."

She added: "After my term as European commissioner and once my cooling-off period ended, in May 2016 I joined Uber as chair of its global policy advisory board. Consistent with my ethical duties as a former European commissioner, I did not have any formal nor informal role at Uber before that particular date of May 2016."

MacGann also defended Kroes, saying he did not believe she had violated any rules or policies in her interactions with him. "She was Mark Rutte's special envoy for Dutch startups, and Uber was a startup with its international HQ in the Netherlands."

> But a spokesperson at the Dutch ministry of economic affairs said Kroes's remit as special envoy would not have entitled her to represent the interests of individual US tech companies based in the Netherlands to Dutch ministers. "Uber was not considered a startup in 2015," the spokesperson said.
>
> Meanwhile, some of the people named in the emails disputed the way the leaked correspondence characterised what had happened. Kamp, the former Dutch economy minister, denied suggestions Kroes attempted – or would have attempted – to get regulators to "back off" Uber.
>
> A spokesperson for Melanie Maas Gesteranus (formerly Schultz) said she recalled there was contact, but "what, when and with whom she did not remember after seven years", adding that such contact did not influence her actions.
>
> Rutte's office said the Dutch cabinet and prime minister had a role in attracting foreign investment and employment to the Netherlands, adding that it was not possible to answer detailed questions in the time available.
>
> Juncker, who denied Kroes permission to work for Uber in 2015 and has since stood down as president, referred questions to the current commission.
>
> "The reason [for refusing permission] was the digital dimension of the services provided by Uber and the link with Ms Kroes' previous portfolio," the commission said. "There is no new element which could put the conclusions drawn at the time into question."
>
> A spokesperson for Timmermans said neither he nor his top officials had any correspondence from Kroes about Uber. Kalanick and Uber's Brussels office had contacted Timmermans, but no meeting took place, the spokesperson said.
>
> Bulc said she did not recall being approached by Kroes about Uber, adding that all her meetings with the company followed standard commission procedures.
>
> Uber said Kroes left its advisory board in 2018, adding: "Since this period, we have implemented new guidelines for our teams in Europe, which govern lobbying and external engagements with policymakers, strengthening our requirements and oversight of those activities."

50. On July 11, 2022, at no later than 9:13 AM eastern time, ICIJ published an article titled "Uber shifted scrutiny to drivers as it dodged tens of millions in taxes":

> In early 2015, European regulators were closing in on Apple, Amazon and Google, accusing the U.S. tech titans of unfair competition and abuse of sweetheart tax deals.
>
> Executives at Uber Technologies Inc. took notice; they feared that their company

could be next, newly leaked documents show. As it expanded its footprint around the globe, the ride-hailing giant had devised ways to save millions of dollars in taxes by routing profits through Bermuda and other tax havens.

"Our corporate tax structure is — in pure European political terms — the Achilles heel of the company," Mark MacGann, Uber's chief lobbyist in Europe at the time, wrote to the company's tax department chief.

As scrutiny ramped up, the leaked documents show, Uber hit on a brazen strategy to steer attention away from its tax liabilities: help authorities collect taxes from its drivers instead.

In an email to other managers, MacGann declared that sharing information on drivers' earnings could "contain" the demands of tax authorities. By doing so, Uber could "avoid broadening of the investigation to other countries and/or other tax matters (corporation)," he wrote.

The Uber Files include emails and other internal company documents leaked to The Guardian newspaper and shared with the International Consortium of Investigative Journalists. The records, which date from 2013 to 2017, reveal how executives at the ride-hailing company managed crises, including blowback over its aggressive tax avoidance strategy, as Uber transformed from scrappy Silicon Valley tech start-up to global giant.

The documents also illuminate how governments struggle to make digital companies pay taxes in the countries where they operate — money that could be invested in health care, education and even the roads used by ride-share companies.

Under its founder, Travis Kalanick, Uber became notorious for its macho corporate culture. There were allegations of rampant sexual harassment, spying on rivals and hindering law enforcement investigations.

The leaked records indicate the same cavalier attitude permeated Uber's approach to tax laws.

According to confidential emails, executives coached regional managers on how to preempt government criticism by talking up "solutions" Uber had devised to ensure that its drivers paid taxes. A digital tax-filing platform tested in partnership with Estonian tax authorities was one of the solutions cited in the emails.

In a 2016 memo about meetings with local African officials, a senior policy manager described how, in Nigeria, the Uber team had successfully shifted the conversation on taxes from Uber to the drivers.

"We met with Tax Authorities in Lagos who lauded our efforts at ensuring [drivers'] tax compliance, and shifted their focus from Uber 'evading tax' to

working together to ensure [drivers'] compliance," the manager wrote.

Executives at Uber knew the company's aggressive stance would attract unwanted attention the documents show.

"Certain topics, such as … corporate taxation are very sensitive and generate a lot of criticism," Uber manager Pierre-Dimitri Gore-Coty wrote in a memo after a November 2015 call with then-CEO Kalanick.

An Uber subsidiary in Bermuda that held the company's valuable ride-hailing technology patents was seen as potentially damaging to the company's reputation. Royalty fees for using the ride-hailing app poured into the Bermuda-based unit, dramatically lowering Uber's global tax bill.

"It is the Bermuda or Cayman part that really makes so [many] people angry in Europe," Rachel Whetstone, then-Uber's communications chief, wrote in an email to executives. "Even just not being part of the Caribbean thing would put us way ahead of the pack when it comes to U.S. tech companies," Whetstone wrote.

"Anyway just between us as it is the issue that shall not be named," she wrote, presumably referring to tax avoidance.

Whetstone didn't comment on Uber's tax strategy.

Uber argues that it's not a transportation company but the operator of a digital platform that connects riders to drivers, who are independent contractors, not employees. The arrangement allows the company to avoid a host of costs and responsibilities, such as making social security contributions and collecting value-added taxes on rides.

"Uber is committed to complying with tax laws and regulations wherever we operate … and to enable Uber vendors, partners and drivers to meet their own legal and tax obligations," company spokeswoman Jill Hazelbaker said in a written response to questions from ICIJ and media partners.

The Dutch connection

Uber's headquarters in San Francisco occupies two modern buildings facing the bay. But the company's financial hub, for its activities in much of the world, is in the Netherlands, a corporate tax haven.

In 2012, a few months after its European debut in France, Uber set up a Dutch company, Uber BV, to receive payments from customers hailing cars in New Delhi, London, Sydney and hundreds of other cities around the world.

Uber BV routed up to 80% of each fare back to the driver. It sent most of the rest to its operation in Bermuda, where corporate income isn't taxed.

The arrangement made it difficult for national taxing authorities to know how much drivers earn because they are paid through the Netherlands.

The leaked documents include an email exchange between lobbying chief MacGann and an Uber spokesman about how to respond to questions from a TechCrunch reporter who had asked why the company's international headquarters was in the Netherlands, and how taxes fit into the picture.

"There is the potential that anything we say is perceived as defensive at best," MacGann wrote. "We really need to show that HUNDREDS of major international firms have been locating in [Amsterdam] for decades. … Amsterdam and the Dutch government have shown that The Netherlands is 'open for business.'"

Uber's special connection with the Netherlands became evident in spring 2015 when tax authorities from France, Germany, Sweden, the United Kingdom and Belgium contacted their Dutch counterpart to request that Uber BV share driver information.

The authorities wanted to know the workers' names and dates of birth, license plates, number of trips, bank accounts and other details to determine their tax liabilities, a leaked email says.

The request initially alarmed Uber managers, leaked records show. They feared that authorities would start targeting drivers — the company's "supply" — demanding back taxes from them and sharing data with other agencies. They also worried that drivers would leave the company and work for Uber's competitors.

In confidential emails to executives, one of Uber's international tax managers, Rob van der Woude, listed the pros and cons of complying with authorities' demands.

"Little financial risk to Uber," he wrote. "Immediate financial liability for partner-drivers."

As Uber executives discussed how to respond, the company relied on Dutch authorities to buy it more time, leaked messages say.

"The Dutch tax authorities are trying to slow down the sharing of information and will likely do the same should new requests by other countries come up," van der Woude wrote in an email.

The documents don't explain what form the slowdown took. But meeting minutes in the Uber Files indicate that, in April 2015, company executives met with five senior Dutch officials at the Dutch consulate in San Francisco to discuss the company's activities in the Netherlands and the timing of the audit by the European authorities. The documents also indicate that Uber was accustomed to Dutch authorities' shielding the company from regulatory scrutiny by other

countries.

"This relationship is of great importance and value in light of our corporate structure and tax effectiveness," van der Woude noted in a confidential message. "The Dutch tax authorities have been collaborative and defensive of us."

The five EU countries were also investigating Uber to assess whether the company was paying income taxes where it should, and whether it should charge a value-added tax on rides.

"This will be an important battle we need the [Dutch tax authorities] to fight for us," van der Woude wrote in an email.

After internal discussions in late 2015, Uber managers decided to comply with the driver information request by European authorities to demonstrate that the company took drivers' tax compliance "seriously," van der Woude wrote.

Dutch officials had given the company enough time to "get our affairs in order," he wrote.

In December 2015, van der Woude shared "positive updates" with his colleagues: a contact working for the Dutch tax office had reassured him that, once the countries involved in the audit received driver information, they would "not take a punitive approach" to collecting taxes from drivers.

The officials also would not disclose that Uber provided the information used to remind drivers to pay their taxes, van der Woude explained in an email to his colleagues.

The five EU countries, plus the Dutch tax office, agreed that Uber's policy not to charge a value- added tax on the service fee was "sound" and would not lead to claims against the company, van der Woude noted in another email.

Both MacGann and van der Woude have since left the company. They didn't comment on their role in dealing with the tax authorities.

Experts interviewed by ICIJ's reporting partners said the Dutch officials may have violated local laws if they somehow stalled or delayed European authorities' request for information, and shared details of the audit with Uber.

A spokesman for the Dutch tax office told Investico reporters that the officials didn't breach any duty or delay the investigation, and that they didn't show any "favoritism" toward Uber.

The tax authorities followed the procedures "correctly" and "are strongly committed" to complying with international agreements, the spokesman said. He did not comment on the Uber case.

Uber expected to send the requested information about its drivers to the Dutch tax office in January 2016, and then the Dutch would share it with other European officials, according to the leaked files.

It is not clear which countries received the data at the time. But, in 2018, Danish tax authorities demanded that about 1,200 Uber drivers pay an additional $1.9 million in taxes after analyzing data provided by the Dutch.

In response to ICIJ's questions, Uber's spokeswoman said the company is "committed to maintaining an open and transparent working relationship with tax authorities."

"As part of our tax reporting obligations and tax audits, Uber routinely provides tax data to tax authorities, in line with tax laws and data protection regulations," she said.

**India: 'Embrace the chaos'**

Travis Kalanick's "love affair" with India started when, as a young coder, he spent a month in the southern town of Varkala, working from the beach, he once said in a television interview.

The second time Kalanick visited the country, he said, was to launch the tech company's first Indian unit, Uber India Systems Private Ltd., in 2013.

"When we started," Kalanick said in the interview, "we were actually just thinking about solving a problem, and then it became a problem we're solving for lots of people. And then, wealth came after it, but it was not just wealth for the people who worked hard on Uber (myself, my co-founder and our employees) but for the population at large."

The leaked files, corporate records and research by financial experts paint a different picture of Uber's contribution to India's economy. They show how the company devised ways to lower its tax bill, fought tax authorities in court and used Dutch subsidiaries to conduct its main business activities in India.

In 2014, months after incorporation, Uber's Indian operations attracted regulators' scrutiny. The central bank accused it of not complying with rules on credit card transactions, and tax authorities said the company wasn't paying service taxes on fares, as required by law.

Officials at the Indian revenue department asked Uber's manager in India to appear before them and give a statement, according to the leaked files.

Uber hired lawyers — and the accounting giant EY — to fight the authorities' claims.

"E&Y/lawyers are comfortable with our position that Uber does not carry any ST

(service tax) liability," Axel Martinez, Uber vice president and treasurer, wrote in a PowerPoint overview of tax issues called "Project Robert Dinero." (The project name appears to be a pun combining the Spanish word for money — "dinero" — and a reference to actor Robert De Niro, star of the film classic "Taxi Driver".)

As Uber lawyers fought the government's claims, Allen Penn, who then headed Uber's Asia operations, sent an email to the Indian team with a smiling emoji encouraging it to stay focused and work hard to "dominate the market :)"

"Embrace the chaos. It means you're doing something meaningful," Penn wrote in the email. "YOU and UBER are the ones that are improving India."

Penn and Martinez did not respond to requests for comments from ICIJ and its media partners. EY declined to comment.

By early 2015, it was clear that Uber had lost its first battle with Indian authorities. The finance ministry required all ride-hailing companies to pay a service tax on all ride fares. It also asked Uber to hand over information on drivers, who had to register with the tax authorities. But the company had a solution to the new levy.

In April 2015, Uber announced it would include the service tax in the ride cost. The leaked records indicate that the company wanted to "show commitment to comply" with Indian rules, choosing an approach similar to the one it adopted in Europe.

We will "ensure partner [driver] compliancy and improve relationship with local authorities," the project's PowerPoint guidelines say. "Goal is to become facilitator for tax collection and remittance."

In the following years, Uber appealed several tax rulings in India. It slashed its corporate income tax bill from $35 million to $8 million for the years 2018, 2019 and 2020, according to financial statements. The company received a favorable ruling after challenging tax claims for 2016 and 2017 and was waiting to see if the authorities would appeal, the most recent financial statement says.

India loses an estimated $16 billion to corporate tax avoidance and other tax abuses every year, according to a recent report by the Tax Justice Network.

**Global reshuffle**

In 2019, former communications chief Whetstone's suggestion that Uber close operations in Caribbean tax havens was partly realized. Before listing on the New York Stock Exchange, Uber restructured its global business.

A Dutch subsidiary purchased the intellectual property that previously belonged to Uber's Bermuda shell company, using a $16 billion loan from Uber's

> Singapore unit. The move followed the EU's crackdown on tax avoidance, an Uber spokesman told Bloomberg News.
>
> But the new arrangement had lucrative tax advantages. Uber structured the loan from its subsidiary to reduce its taxable income in the Netherlands by an estimated $1 billion a year for two decades, the term of the loan, according to a report by the Center for International Corporate Tax, Accountability and Research, or CICTAR.
>
> Tax justice advocates were outraged. One called Uber "the Champions League of tax avoidance."
>
> CICTAR researchers estimated that, in 2019, the year of the IPO, Uber avoided at least $556 million in taxes globally. In recent corporate filings, Uber said it is currently facing numerous audits by tax agencies in the U.S. and abroad.
>
> According to Jason Ward, the CICTAR researcher who reviewed Uber's arrangements in the Netherlands, India and other countries, companies like Uber "are continually shuffling" their structure in an effort to avoid taxes and confuse tax authorities.
>
> "The more it changes," he said, "the harder it is to follow."

51. On July 11, 2022, at 1:00 PM Eastern Daylight Time, The Guardian published an article titled "Star executive quit Uber as it faced pressure over UK tax structure":

> Uber lost one of its most successful dealmakers at a time when the company feared his position at the cab-hailing app would undermine its tax avoidance structure, leaked documents suggest.
>
> The leaked notes record that Fraser Robinson – one of Uber's star executives who was based in London and had led its $3.5bn investment deal with Saudi Arabia in 2016 – was told by a senior executive that he would "have to move to AMS [Amsterdam]". Uber was seeking to persuade UK tax collectors that the company was not being partly managed – and therefore taxable – in the UK.
>
> A document in the Uber files, a trove of confidential files leaked to the Guardian, noted: "[Robinson] refused to move to AMS … HMRC claim that Uber's EMEA [Europe, Middle East and Africa] earnings [are] taxable in UK because of Fraser."
>
> Robinson, who was not responsible for Uber's tax structure, stepped down from the company in 2017 after refusing to move to Uber's international headquarters and tax base in Amsterdam. He is understood to have resisted Uber's request for family reasons and a source said he was already thinking about other challenges after a successful stint at the company.

He was a prized employee and was described internally as the executive who "spearheaded some of the company's most transformational deals", including the investment from Saudi Arabia's Public Investment Fund (PIF), "which at the time was the largest private placement in history".

The revelations also raise questions for the former UK chancellor George Osborne, who the leaked documents suggest was a private supporter of the US company's efforts to grow its UK business, just as the company simultaneously positioned itself to avoid future UK taxes.

Osborne met the Uber founder Travis Kalanick at the World Economic Forum in Davos during January 2016 – just days after the company had won a major UK regulatory victory when Transport for London (TfL) abandoned proposals to tighten the regulation of private-hire vehicles.

In a leaked email titled "Davos feedback" sent after the conference, Uber's chief European lobbyist, Mark MacGann, said: "George Osborne is a strong advocate. He liked to believe that he's responsible for the positive TfL consultation outcome."

If the email reflected reality, the British chancellor had seemingly been assisting a US company just as it was attempting to avoid paying UK taxes.

A former HMRC tax inspector suggested to the Guardian: "Having senior guys based in London will always carry a risk that HMRC might assert that there is UK [permanent establishment] of the … company or even that the … company is being run from London.

"So they may have felt exposed to a serious HMRC challenge … and needed to put their house in order quickly."

Uber, which has only once recorded a global annual profit, had created a corporate structure similar to numerous other US firms whereby profits could be diverted offshore – frequently to Amsterdam. The structures, which are legal but arguably unethical, have resulted in criticism of some major US companies employing them to avoid UK taxes, including Starbucks and Google.

Under the model, passengers paid millions of pounds in fares from Uber rides in the UK directly to a Dutch-based payments processing company. Uber could then argue that profits on those rides should be taxed offshore – even though the transactions physically took place in the UK – unless HMRC could establish that the global company had a UK corporate presence.

Instead, the cab-hailing app's UK firm primarily received its revenue from an Amsterdam sister company, which paid the London firm for "marketing services" – which resulted in £59.5m of revenues and £54.9m of costs in 2017, according to accounts filed at Companies House.

> A spokesperson for Osborne said: "While the government inherited from its predecessors a tax code that meant the tech companies paid little tax, it was George Osborne as chancellor who – with Germany – initiated the international OECD negotiations to change that, a process which led to the widely welcomed global agreement last year."
>
> Uber said: "Uber is committed to complying with tax laws and regulations where we operate, including in the UK and the Netherlands."

52. On this news, Uber's share price dropped $1.15 per share, or 5%, to close at $21.19 per share on July 11, 2022.

53. The revelation of this misconduct led to European authorities to launch an investigation into Uber's relationships with European authorities. On September 29, 2022, Politico reported that OLAF, the EU agency charged with investigating fraud and misconduct in EU institutions, would be investigating Nellie Kroes for her relationship with Uber and whether she lobbied on behalf of Uber during her cooling off period". In addition, according to reporting by the ICIJ on October 25, 2022, on that date Mark MacGann testified before the European Parliament that "Uber had misled the world about the benefits of the gig economy, paid academics to skew findings, swamped markets and 'weaponized' drivers and customers in its own interests against elected officials."

**ADDITIONAL ALLEGATIONS IN SUPPORT OF SCIENTER**

54. The centrality of Uber's Amsterdam subsidiary to Uber's operations, particularly its tax avoidance strategies, supports a strong inference of Khosroshahi's scienter. Since 2012, Uber used its Netherlands subsidiary as a means of sheltering its revenues from taxation from international jurisdictions, and in the lead up to the IPO placed even more importance on their Netherlands subsidiary, restructuring the company so that it, rather than its subsidiary in Bermuda, would hold Uber's patents. Khosroshahi was in charge of shepherding Uber to an IPO, and since the sale of Uber's IP to its Netherlands subsidiary was closely connected to the IPO, Khosroshahi was aware of it, and therefore of the crucial nature of the Netherlands as a tax haven.

55. In addition, the fact that Khosroshahi was brought into Uber to "clean up" the various scandals that arose under Kalanick's watch supports a strong inference of scienter.

Given that Uber's reported use of the kill switch received media publicity in 2018, shortly after Khosroshahi became CEO of Uber, and that Khosrowshahi had a mandate to investigate and remedy misconduct such as the use of the kill switch, Khosroshahi knew, or was reckless for not knowing, the circumstances under which it was used, including the then-undisclosed fact that Kalanick himself ordered its use to hinder an investigation by the Dutch authorities.

56. Khosrowshahi's participation in the Special Matters Committee supports scienter. Khosrowshahi testified in the trial of Joseph Sullivan that he participated in meetings of the Special Matters Committee. Khosrowshahi testified that he received updates on the progress of the Special Matters Committee by virtue of being present at their meetings. The Committee was tasked with investigating accusations made against the company. It retained multiple law firms to conduct an extensive investigation into the various scandals that arose under Kalanick's leadership. In addition, in at least one instance he asked outside counsel to conduct an investigation into a data breach incident outside of the special matters committee once the incident was brought to the attention of the committee. Through the special matters committee investigation, Khosroshahi was aware of the truth behind the allegations made against Uber in the years leading up to Uber's IPO.

57. The centrality of Uber's Amsterdam subsidiary to Uber's operations, particularly its tax avoidance strategies, supports a strong inference of Chai's scienter. Since 2012, Uber used its Netherlands subsidiary as a means of sheltering its revenues from taxation from international jurisdictions, and in the lead up to the IPO placed even more importance on their Netherlands subsidiary, restructuring the company so that it, rather than its subsidiary in Bermuda, would hold Uber's patents. Chai responsible for Uber's finances as Uber prepared for an IPO, and since the sale of Uber's IP to its Netherlands subsidiary was closely connected to the IPO, Chai was aware of it, and therefore of the crucial nature of the Netherlands as a tax haven.

**PLAINTIFFS' CLASS ACTION ALLEGATIONS**

58. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or

otherwise acquired the publicly traded common stock of Uber during the Class Period (the "Class") and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

59. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's common stock was actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

60. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

61. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

62. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether Defendants' acts as alleged violated the federal securities laws;

(b) whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

(c) whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the

circumstances under which they were made, not misleading;

(d) whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(e) whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(f) whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(g) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

63. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

64. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) the Company's common stock is traded in efficient markets;

(d) the Company's market for the Company's common stock was liquid and traded with moderate to heavy volume during the Class Period, with an average of 122,358,066.6 shares trading per week;

(e) the Company traded on NYSE, and was covered by more than 50 analysts;

(f) the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; Plaintiffs and

members of the Class purchased and/or sold the Company's common stock between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(g) Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

65. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

66. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**COUNT I**

**Violation of Section 10(b) of The Exchange Act and Rule 10b-5**

**Against All Defendants**

67. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

68. This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

69. During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

70. The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue

statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiffs and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

71. The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

72. Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiffs and the Class.

73. As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

74. Had Plaintiffs and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

75. As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

76. By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

## Violation of Section 20(a) of The Exchange Act

## Against The Individual Defendants

77. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

78. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

79. As officers of the Company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company and to correct promptly any public statements issued by the Company which had become materially false or misleading.

80. Because of their positions of control and authority as senior officers, Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual

Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

81. The Individual Defendants, therefore, acted as controlling persons of the Company. By reason of their senior management positions, the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. The Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

82. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demands a trial by jury.

Dated: January 30, 2023

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/ Jonathan Stern

Jonathan Stern, Esq.

275 Madison Avenue, 40h Floor
New York, New York 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: jstern@rosenlegal.com
Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Lead Counsel for Plaintiffs*

**THE SCHALL LAW FIRM**

Brian Schall, Esq.
2049 Century Park East, Ste. 2460
Los Angeles, CA 90067
Telephone: (310) 301-3335
Fax: (877) 590-0482
Email: brian@schallfirm.com

*Additional Counsel*

**PROOF OF SERVICE**

I, Laurence M. Rosen, hereby declare under penalty of perjury as follows:

I am the managing partner of The Rosen Law Firm, P.A., with offices at 355 South Grand Avenue, Suite 2450, Los Angeles, CA 90071. I am over the age of eighteen.

On October 17, 2022 I electronically filed the following **NOTICE OF MOTION AND MOTION OF MOVANT ROBERT LONG FOR APPOINTMENT AS LEAD PLAINTIFF AND APPROVAL OF COUNSEL; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** with the Clerk of the Court using the CM/ECF system which sent notification of such filing to counsel of record.

I certify under penalty of perjury under the laws of the United States of America that the foregoing in true and correct.

Executed on October 17, 2022.

/s/ Laurence M. Rosen
Laurence M. Rosen